Argued June 5, affirmed June 20, petition for rehearing
denied July 17, 1962

# SMITH *v.* WHITE

372 P. 2d 483

*Burton H. Bennett,* Portland, argued the cause for appellant. With him on the brief were Anderson, Franklin, Jones & Olsen.

*Hugh B. Collins,* Medford, argued the cause for respondent. On the brief were Collins & Redden.

Before McAllister, Chief Justice, and Rossman, Goodwin and Lusk, Justices.

LUSK, J.

The plaintiff brought this action against the defendant, a chiropractor, to recover damages for malpractice. The jury returned a verdict for the defendant and plaintiff appeals.

The single assignment of error challenges a ruling of the trial court which sustained the objection of the defendant to an offer of proof made by the plaintiff in rebuttal.

The plaintiff, Mrs. Grace V. Smith, had for many years suffered pain in the region of her left hip. In 1950 she underwent a fusion of the lumbar sacral

joint, which apparently gave her no permanent relief; and after consulting many medical doctors and surgeons she was treated by the defendant, Doctor Byron A. White on March 14, 1958. Doctor White has practiced his profession in McMinnville, Oregon, since 1921.

The plaintiff alleged in her second amended complaint that the defendant was negligent, among other particulars, "[i]n the use of extreme and excessive force in the process of the chiropractic orthopedic manipulation so as to break the screws loose in the pre-existing fusion, necessitating their subsequent removal." In the course of her testimony in support of this charge, the plaintiff was asked:

"Q Did he [the defendant] say anything to you about what kind of blow he would strike? Did he have a name for it?

"A Yes, he called it his famous 40-pound blow, and that my ligaments seemed strong."

Testifying in his own behalf, the defendant described the treatment which he administered to the plaintiff as follows:

"Q And how would you describe the manipulative therapy that you used?

"A That's a very simple thing. After the patient is thoroughly relaxed we turn them over on their stomach and facing down we check out with our fingers the sore spots, or what we call the 'trigger points' in the sacroiliac ligaments that hold the sacrum. Her's seemed to be very loose, and we found several trigger points. Now, those trigger points are released through reflex action by a tapping motion through my finger to the reflex centers. The reason I use my finger on there is that I can locate directly the trigger point or sore section of that particular ligament we attempted to release and contract.

"Q Now, does the finger also—

"A (interrupting)—relieve the soreness and contract the ligament is what I better say.

"Q Does the finger also serve the purpose of obsorbing any force?

"A It does.

"Q You have been using this method now for 40 years?

"A Since 1926.

"Q And have you ever known it to cause any bruises on anybody—any person—

"MR. OLSEN: Objection—

"THE WITNESS: No.

"THE COURT: Objection sustained.

"Q (By Mr. Redden) In your opinion, Doctor, could that treatment bring bruises to any person?

"A No."

The defendant denied using excessive force or that his manipulation was such as to cause pain to the patient.

On redirect examination the defendant gave the following testimony:

"Q Now, Doctor, have you ever heard of the expression 'A famous 40-pound blow?'

"A No.

"Q Or anything like that?

"A No.

"Q Do you use any treatment that could be so described?

"A No."

Additional testimony was given by Doctor Ralph Failor concerning the "40-pound blow." Doctor Failor is a chiropractor who assisted the defendant in the

treatment given the plaintiff on March 14, 1958. He was asked by counsel for the defendant:

"Q Doctor, have you ever heard of any chiropractic—medical or orthopedic, or any type of manipulation at all—called a '40-pound blow,' or 'famous—the famous 40-pound blow,' or anything like that of that nature?

"A No, sir, I have not."

On recross-examination of the defendant, he testified as follows:

"Q Doctor, I understood you to say in the course of your examination that you had never known a patient to become swollen or bruised as the result of your orthopedic manipulation, is that right?

"A That's right.

"Q Is that correct, sir?

"A That's right.

"Q I understood you right?

"A Right."

John C. Lundquist was called by the plaintiff as a rebuttal witness. He testified that in March 1958 his wife was a patient of Doctor Byron White. The transcript of testimony proceeds:

"Q Do you know whether or not while your wife was a patient at the Chiropractic Hospital she received a manipulation of the low back by Dr. Byron White—

"MR. REDDEN: One moment, please. I don't think this is material at all for the treatment his wife had.

"MR. COLLINS: I'll object to it as attempted impeachment on the collateral matter.

"MR. OLSEN: It is not collateral, your Honor; it is right to the meat of the case.

"THE COURT: All right. We will have a recess at this time and I'll hear counsel on what you propose to prove. We'll have a 10-minute recess.

"(Recess)

"(Following heard out of the presence of the jury)

"THE COURT: You wish to make an offer of proof by asking the witness questions you propose to offer?

"MR. OLSEN: Yes.

"DIRECT EXAMINATION (Cont'd)
"BY MR. OLSEN:

"Q  Was your wife treated by Dr. Byron White while she was a patient in his hospital in McMinnville?

"A  That's right, she was.

"Q  And do you know the names of the doctors that participated in the examination?

"A  Yes, there were three. Want their names?

"Q  Do you recall?

"A  Dr. White, Dr. Failor and I think Dr. Mecham.

"Q  And do you know whether or not a manipulation was, in fact, performed to your wife?

"A  Yes, I watched the entire proceedings.

"Q  All right. At any time during the proceedings did Dr. White or one of his assistants, in your present (sic) and in the presence of Dr. White—you describe the amount of force that would be used in the performance of this manipulation.

"A  I think the amount of force was described prior to her actually going into the hospital for treatment.

"Q  Was it described in your presence?

"A  Yes. At that time my wife asked why couldn't this treatment be performed right in the office—'Why couldn't I go the (sic) the hospital.' He mentioned something then about—

"Q Do you mean Dr. White?

"A Yes, Dr. White; he mentioned there that there is a 40-pound thrust—that is in connection with the manipulation of the back—and therefore it could not be performed in the office.

"Q And did you see the manipulation performed?

"A Yes. Both Dr. White and Dr. Failor encouraged me to watch the entire manipulation and I was in there in the room—in the same room for the entire period of time.

"Q And how was the manipulation performed?

"A The manipulation was performed by, I would say, Dr. White thrusting with his hand against her side and the other two doctors on the other side preventing her from, say, going off the table or something of that nature. There had to be two on the other side to compensate for the thrust on the other side.

"Q Now, after this treatment was rendered to your wife was she taped up?

"A Yes, after the treatment was over with she was completely taped on the back.

"Q All right. And after the tape was removed was that at the conclusion of the hospitalization?

"A Yes. She was there, I think, approximately 10 days, and—

"Q And after the tape was removed from her did you observe the area in your wife's back where the manipulation had been applied?

"A Yes. In the lower part of the back there appeared to be a bruised area.

"Q About how large was the bruised area?

"A Oh, I would say—I'd have to explain with my hands. Something like this area (indicating).

"Q Six or eight inches?

"A Well, maybe not quite that much, but in that area.

"Q Was there any swelling in addition to the discoloration?

"A There was a slight swelling; I noticed more of the black and blue marks. My wife was concerned about it too.

"MR. OLSEN: That is the proof that I intended to elicit from the witness, your Honor."

Thereupon counsel for the defendant objected to the offer of proof and the court sustained the objection.

■■ By the offer of proof the plaintiff sought to impeach the defendant and his witness Doctor Failor by contradicting their testimony to the effect that they had never heard of a 40-pound blow as a part of chiropractic technique, and by contradicting the testimony of the defendant on cross-examination that he "had never known a patient to become swollen or bruised as the result of [his] orthopedic manipulation." The defendant urges that admission of the evidence would have violated the rule against impeachment on a collateral issue; the plaintiff argues that the rule has no application where, even though the testimony is upon a collateral matter, it is injected into the case by the party sought to be impeached, particularly on direct examination. The rule upon this subject was thus stated in an early case by Chief Justice ROBERT S. BEAN:

"Moreover, it is well settled that a witness can not be cross-examined as to any fact that is collateral and irrelevant to the issue, merely for the purpose of contradicting him by other evidence, if he should deny it, in order thereby to discredit his testimony * * *." *Williams v. Culver*, 39 Or 337, 341, 64 P 763.

See, also, *Houser et al v. Heider et al*, 221 Or 7, 22, 23, 350 P2d 422; *Peters v. Consolidated Freight Lines*,

157 Or 605, 610, 73 P2d 713 and cases there cited; 88 CJS 213, Trial § 101. And where a witness is interrogated for the purpose of impeachment as to a matter not relevant to the issue and not touched on in direct examination his answer is as a general rule binding on the party cross-examining him. *Houser et al v. Heider et al,* supra; *Peters v. Consolidated Freight Lines,* supra; *State v. McCarroll,* 123 Or 173, 177, 261 P 411.

■ The testimony that the defendant and Doctor Failor had never heard of a 40-pound blow was not brought out on cross-examination, but was introduced into the case by these witnesses in response to questions put by the attorney for the defendant, on the redirect examination of the defendant and the direct examination of Doctor Failor. The rule above stated therefore is not applicable to that testimony, and we may assume for present purposes that impeaching testimony was admissible in rebuttal. See *Hamilton v. Hamilton Mammoth Mines,* 110 Or 546, 550, 223 P 926; *Eaves v. Lamb,* 209 Ark 987, 989, 193 SW2d 328; *Kerbow v. Bell* (1953 Okla) 259 P2d 317, 38 ALR2d 500.

■ But the proffered testimony with reference to the treatment of the wife of the witness Lundquist by the defendant, and the bruise claimed to have been received by her in the course of that treatment, is on a different footing. No question was asked of the defendant on direct examination which related to the treatment described in the offer of proof. The defendant, after describing the treatment which he administered to the plaintiff in the language which we have quoted, was asked this question: "In your opinion, Doctor, could *that treatment* bring bruises to any person?" He answered: "No." On cross-examination by counsel for the plaintiff he was asked this question:

"Doctor, I understood you to say in the course of your examination that you had never known a patient to become swollen or bruised as the result of your orthopedic manipulation, is that right?" He answered: "That's right." The question was ambiguous. It might be construed to refer either to treatment of the kind which the defendant testified he had administered to the plaintiff, or to any "orthopedic manipulation" of whatever sort, that he had ever performed in the course of his 40 years of practice. If the former meaning is accepted (and evidently the defendant so understood the question), the proffered testimony was not admissible because it did not relate to the defendant's testimony on the subject. The plaintiff offered to prove that in the treatment of Mrs. Lundquist the force employed by the defendant was so great that two doctors were stationed on the opposite side of the table from Doctor White to prevent the patient from "going off the table." It was in connection with an operation of that sort that the plaintiff offered to prove that Mrs. Lundquist sustained a bruised area in her back. If the question addressed to the defendant on cross-examination is to be construed as including treatment of this character, then the answer was not subject to contradiction because the defendant did not testify on direct examination that treatment of the kind described in the offer of proof could not cause a bruise to the patient. In that view, the evidence sought to be given would come within the rule which frowns upon the impeachment of a witness on collateral matters brought out on cross-examination.

■ That this testimony was upon a collateral matter is clear, for the test of whether a fact inquired of in cross-examination is collateral is whether the cross-examining party would be entitled to prove it as a

part of and tending to establish his case. *Houser et al v. Heider et al,* supra, 221 Or at 24; *Peters v. Consolidated Freight Lines,* supra, 157 Or at 611, and cases there cited.

■ It does not follow, however, from the fact that some of the proffered testimony may have been admissible that the court erred in rejecting the offer of proof. Where there is a single offer of proof which includes matter that is objectionable, the entire offer may be rejected. *Heise et ux v. Pilot Rock Lbr. Co.,* 222 Or 78, 100, 352 P2d 1072; *Morey, Administratrix v. Redifer et al,* 204 Or 194, 207, 264 P2d 418, 282 P2d 1062; *Cosgrove v. Tracey,* 156 Or 1, 7, 64 P2d 1321; *Taylor v. Taylor,* 54 Or 560, 568-569, 103 P 524; *Lohsen v. Lawson,* 106 Vt 481, 174 A 861, 95 ALR 309; 53 Am Jur 89, Trial § 99. While the offer in this case took the form of questions and answers, it was no less a single offer than if the attorney had, in the conventional mode, stated to the court what he expected to prove by the witness. The court in such a case "is under no duty to sort out admissible matter, but when a portion of such testimony is incompetent may reject the testimony as a whole." *Cosgrove v. Tracey,* supra.

The judgment is affirmed.